

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRENDA GUADALUPE TREVINO, | § | No. 08-14-00216-CR |
| Appellant, | § | Appeal from the |
| v. | § | County Criminal Court at Law |
| THE STATE OF TEXAS, | § | Number Two |
| Appellee. | § | of El Paso County, Texas |
| | § | (TC# 20140C02462) |
| | § | |

## **O P I N I O N**

Appellant was convicted by a jury of Interference with Public Duties, a Class B misdemeanor, and sentenced by the trial court to one day in jail. On appeal, Appellant contends the evidence is insufficient to support her conviction and that the trial court failed to instruct the jury sua sponte on the statutory speech-only defense. We affirm.

## BACKGROUND

On November 29, 2013, a 911 dispatcher received a report that Appellant's 17-year-old sister was threatening suicide and had a knife. El Paso Police Officer James O'Connor was dispatched to the home. The jury heard three different versions of what occurred at the residence.

### Officer O'Connor's Testimony

Officer O'Connor testified that Appellant's mother met him at the front door of the family's residence. The mother told Officer O'Connor that she and Appellant's sister had been arguing over the sister's boyfriend, and that the sister had taken a kitchen knife into her bedroom and was threatening to cut herself. The mother directed Officer O'Connor to the bedroom, where he observed Appellant and her sister sitting together on the edge of a bed, conversing in Spanish. The sister had one of her arms hidden under a blanket, and Officer O'Connor was concerned she might be holding the knife with that arm.

Officer O'Connor, who was in full police uniform, stood at the doorway and identified himself, stating in English that he needed to speak with the sister. After being ignored twice, O'Connor repeated his statement in Spanish. Appellant made eye contact, then turned her head, rolled her eyes, and continued her conversation with her sister.

Shortly thereafter another officer arrived at the scene, and once again Officer O'Connor announced that he needed to speak with the sister. At that point, Appellant rose from the bed and left the room. Both officers entered the room, and Officer O'Connor spoke with the sister and asked her where the knife was. Officer O'Connor testified that because the sister's arm was still hidden under the blanket and the knife had not yet been located, each officer grabbed one of the sister's arms, placed her on the ground, and handcuffed her out of concern for both their safety and her safety.

At the time, Appellant was in the hallway outside the bedroom door, yelling in both English and Spanish that the officers were "abusing" her sister, and shouting at her younger sister to record the incident on a cell phone. As the officers began to escort the sister from the bedroom, Appellant planted herself in the door frame with her legs out forming an "X" and blocking the

2

officers, and stated: "You're not taking my sister[.]" Appellant initially refused Officer O'Connor's request to remove herself from the doorway, but eventually moved away when another family member handed her a cell phone. As Appellant was attempting to set up the cell phone to record the incident, the officers were able to take Appellant's sister out of the bedroom and escort her down the hallway toward the front door.

As the officers were walking through the hallway, however, Appellant approached from the opposite direction, and according to Officer O'Connor, extended out her arms and pushed him in his chest. Officer O'Connor testified this caught him off guard, threw him off balance, and knocked him backward. Even when requested, Appellant refused to take her hands off Officer O'Connor. Appellant continued to push Officer O'Connor backward, and said she would not let the officers take her sister from the home. Officer O'Connor pushed forward, however, using the force of his own chest to pass by Appellant. Appellant, who was wearing high heels, tripped, causing her to step out of the way, which allowed the officers to continue toward the front door. However, Appellant once again confronted the officers and blocked the front doorway. Officer O'Connor warned Appellant to move out of the away. He then physically moved Appellant, placed her on a nearby chair, and ordered her to remain there, which allowed the other officer to exit the residence with Appellant's sister. Officer O'Connor acknowledged that he had used force in placing Appellant on the chair, but denied that he had injured her in the process.

Appellant's mother requested that the officers transport Appellant's sister to University Behavioral Health, a mental health facility in El Paso, and Officer O'Connor exited the home to interview Appellant's sister who was now waiting in his patrol car. During the interview, the sister admitted that she had initially taken a knife from the family's kitchen, but claimed that she

3

had thrown it away somewhere in the residence before entering her bedroom. Officer O'Connor visually determined that she did not have a weapon. He then started drafting a request for an emergency detention order, and subsequently transported Appellant's sister to the hospital in his patrol car.

## The Testimony of Appellant's Mother

Appellant's mother testified that her 17-year-old daughter suffers from bipolar depression, and that she had taken a knife from the kitchen and had gone to her bedroom and locked the door. She and other family members became concerned that the Appellant's sister might harm herself, prompting her 13-year-old daughter to call the police. The mother testified that when Officer O'Connor arrived at the residence, he initially advised her that he did not speak Spanish. She escorted Officer O'Connor to the bedroom where Appellant was speaking with her sister. According to the mother, Officer O'Connor asked her in English which of the two daughters had a knife, and she pointed to Appellant's sister. According to the mother, Officer O'Connor, with no apparent warning, then pushed Appellant toward the hallway, causing her to hit her arm on the door frame or wall.

The mother recalled that Officer O'Connor then told her and the other family members to leave the bedroom, and they retreated to the dining room. While in the dining room, she claimed she observed Officer O'Connor push Appellant a second time while he was escorting Appellant's sister out of the bedroom into the hallway.

## Appellant's Testimony

Appellant testified and presented a third version of what occurred that morning. Appellant acknowledged that her sister suffers from mental issues, that the police had been called

4

to the residence on prior occasions due to her behavioral problems, and on that this particular occasion, the family had seen her sister take a knife from the kitchen, prompting her 13-year-old sister to call the police. Appellant recalled, however, that her mother had already taken the knife away from her sister before the officers arrived.

Appellant also acknowledged that she was in the bedroom speaking with her sister when Officer O'Connor arrived. She further acknowledged that Officer O'Connor was in full uniform and that she recognized him to be a police officer when her mother escorted him to the bedroom. She claimed, however, that her mother then left the bedroom, and that Officer O'Connor stood silently in the doorway for three to five minutes until she finished speaking with her sister, after which she voluntarily got up and left the room. Appellant testified that she then heard her sister scream and returned to the bedroom, and observed Officer O'Connor holding her sister's arms behind her back. She told Officer O'Connor, in Spanish, that he "couldn't do what he was doing to her." According to Appellant, Officer O'Connor did not respond and instead grabbed her by the arm and pushed her down the hallway, while at the same time holding her sister with his other arm.

Around this same time, Appellant recalled, her 13-year-old sister appeared with a cell phone, and at her request, began recording the scene. Appellant claimed that Officer O'Connor, while still holding her sister with one arm, used his free arm to grab the cell phone away from her younger sister and threw it to the ground in an apparent attempt to prevent her younger sister from recording the incident. Although Appellant's sequence of events was somewhat confusing, she recalled that at some point, she protested that Officer O'Connor was using excessive force on her sister, prompting Officer O'Connor to transfer custody of her sister to the other officer. Appellant

5

claimed that Officer O'Connor then grabbed her by the arm and pushed her, causing her to hit the dining room table, after which she fell "down to the chair and from the chair to the floor."

Appellant denied that she interfered with or impeded the officers that morning, and testified that Officer O'Connor was the aggressor in the situation. Appellant further claimed that she did not know any English, and that Officer O'Connor only spoke to her in English, implying that she may not have understood what was occurring when Officer O'Connor arrived at the scene.[1]

After the officers had exited the residence with her sister, Appellant contacted 911 and requested that a Spanish-speaking officer be dispatched to the residence. Shortly thereafter, Officer O'Connor's supervisor arrived and spoke with both Officer O'Connor and Appellant. According to Appellant, she informed the supervisor that she believed Officer O'Connor had used excessive force against her and her sister. The supervisor advised her of her right to file a complaint against Officer O'Connor, but at the time, Appellant did not believe she had sufficient proof to establish that the officer had abused her. Appellant explained, however, that she later changed her mind and decided to file a complaint against Officer O'Connor after she realized that his treatment of her had left bruises on her arms and leg, and after she found out that Officer O'Connor had "placed charges" against her for interfering with the performance of his duties. Appellant filed a complaint against Officer O'Connor two days after her arrest, claiming that he had used excessive force. The complaint was investigated by the El Paso Police Department's internal affairs division and was determined to be unfounded.

---

[1] Officer O'Connor testified in Spanish when recalling his conversations with Appellant's mother. Appellant acknowledged that she heard Officer O'Connor speak Spanish on the witness stand. Appellant's mother provided confusing testimony on the subject, first testifying that all of her daughters knew English, but later testifying that Appellant did not speak much English and mainly communicated in Spanish.

**The Charges Against Appellant**

While still at the scene, Officer O'Connor informed his supervisor that he believed Appellant had "impeded' and "interfered" with his investigation.   Officer O'Connor testified that he did not want to arrest Appellant immediately for that offense, but rather wanted a neutral magistrate to determine if probable cause existed for her arrest.   Appellant was thereafter arrested on a warrant issued by a magistrate, and charged with the Class B misdemeanor offense of Interference with Public Duties in violation of Section 38.15 of the Texas Penal Code.   In particular, the information alleged that while Officer O'Connor was "performing a duty or exercising authority imposed or granted by law, to-wit: conducting an investigation, [Appellant] with criminal negligence [did] interrupt, disrupt, impede, or interfere with the said James O'Connor by pushing the said James O'Connor[.]"

## DISCUSSION

### The Evidence was Sufficient to Support the Jury's Verdict

In her first issue, Appellant contends the evidence was insufficient to support the jury's verdict, claiming that the State presented no evidence that Officer O'Connor was conducting an "investigation" pursuant to a duty imposed by law at the time she allegedly pushed him as alleged in the information.

### *Standard of Review*

We review sufficiency complaints under the legal sufficiency standard enunciated in *Jackson v. Virginia.   Fernandez v. State,* 479 S.W.3d 835, 837 (Tex.Crim.App. 2016); *Brooks v. State,* 323 S.W.3d 893, 912 (Tex.Crim.App. 2010).   The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

7

have found the essential elements of the crime beyond a reasonable doubt." *Fernandez,* 479 S.W.3d at 837–38 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). If a rational fact finder could have so found, we will not disturb the verdict on appeal. *Id*. at 838; *see also Temple v. State,* 390 S.W.3d 341, 363 (Tex.Crim.App. 2013).

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs v. State,* 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Id.* at 170 (citing *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Id*.; *see also Clayton v. State,* 235 S.W.3d 772, 778 n.12 (Tex.Crim.App. 2007) (observing that it is the fact finder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

### *Applicable Law*

The offense of Interference with Public Duties is defined in Section 38.15 of the Texas Penal Code in relevant part as:

> (a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with:
>
>> (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law; . . . or
>>
>> (7) a person who . . . is performing a duty or exercising authority imposed or granted under the . . . Health and Safety Code[.]

TEX. PENAL CODE ANN. § 38.15(a) (West 2016). As Appellant correctly points out, the State is bound to prove its case by presenting evidence to support the charge as alleged in the information.

8

*See Carney v. State,* 31 S.W.3d 392, 396 (Tex.App. – Austin 2000, no pet.) (where State alleged that the defendant had interfered with an officer's duties by "blocking entry into a residence," the State was required to prove that the defendant committed the offense in the particular manner and means as alleged in the indictment); *see also Avery v. State*, 359 S.W.3d 230, 237 (Tex.Crim.App. 2012) (citing *Cada v. State,* 334 S.W.3d 766, 776 (Tex.Crim.App. 2011) (the State must prove the offense as charged, and may not prove its allegations by proof of a "different, uncharged, manner and means" of committing the offense)).

The information expressly alleged that Appellant interfered with the performance of Officer O'Connor's duties by "pushing" him while he was "conducting an investigation[.]" Therefore, in the present case, the State was required to prove that: (1) Appellant (2) with criminal negligence (3) did interrupt, disrupt, impede or otherwise interfere with (4) Officer O'Connor, a peace officer, (5) while he was performing a duty or exercising authority imposed or granted by law (6) by pushing Officer O'Connor (7) while Officer O'Connor was conducting an "investigation." *See Carney*, 31 S.W.3d at 396 (setting forth elements of the offense).

### *Analysis*

Appellant claims the evidence was insufficient to show: (1) that Officer O'Connor was performing a duty or exercising authority imposed or granted by law when the alleged interference occurred; or (2) that Officer O'Connor was conducting an "investigation" pursuant to that authority at the time of the alleged offense.[2] In support of her argument, Appellant points out that

---

[2] Appellant also appears to contend the indictment did not provide sufficient notice of the offense charged, as it did not adequately describe the nature of the duties that Officer O'Connor was performing or the nature of the "investigation" that he was conducting at the time of the alleged offense. Appellant, however, did not raise that objection at trial, and we decline to address it on appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b) (West 2005) ("If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding."); *see also Duffy v. State,* 33

Officer O'Connor was not called to the family's residence to investigate a crime, and that he was instead there on what she describes as a "service" call to obtain an emergency detention order so that he could transport her sister to a hospital for medical treatment. Appellant asserts that Officer O'Connor merely "took a suicidal girl into custody without investigation," and that the State therefore did not present sufficient evidence to support its claim that he was conducting an "investigation" authorized by law as alleged in the indictment. There are several problems with Appellant's argument.

First, Appellant cites no authority for her apparent belief that the term "investigation" is limited to only an investigation of a crime or Penal Code violation. The Penal Code does not define the term "investigation," and the jury was free to assign to the term its common and ordinary meaning. *See Alexander v. State*, 906 S.W.2d 107, 111 (Tex.App. – Dallas 1995, no pet.) ("[i]n the absence of a statutory definition, words are to be taken and understood in their common and ordinary meanings[,]" and "[j]urors are presumed to know and apply such common and ordinary meanings") (citing *Williams v. State*, 674 S.W.2d 315, 322 (Tex.Crim.App. 1984), and *Cuevas v. State*, 742 S.W.2d 331, 346 (Tex.Crim.App. 1987)). A criminal investigation is but one of many types of investigations that a person may conduct. By definition, the term "investigation" has a much broader meaning, including the act of inquiring into virtually any matter. *See, e.g., Investigation Definition*, Webster's New Universal Unabridged Dictionary 966 (2d ed. 1983) (defining "investigation" as a "careful search," a "detailed examination," and a "systematic inquiry").

S.W.3d 17, 26 (Tex.App. – El Paso 2000, no pet.) (appellant waived error where he failed to object to a defect in the indictment prior to trial).

10

More importantly, police officers are expressly tasked by statute to investigate more than just crimes and Penal Code violations. In particular, they are specifically tasked with investigating emergency situations in which a person with a mental illness is threatening to harm themselves. Section 573.001 of the Texas Health and Safety Code allows a peace officer to take a person into custody if he has reason to believe the person has a mental illness and there is a substantial risk of serious harm to the person or others unless they are immediately restrained. TEX. HEALTH & SAFETY CODE ANN. § 573.001(a) (West Supp. 2016). The statute further provides that in determining whether there is a substantial risk of serious harm to the person or others, a peace officer may consider a variety of factors, including the person's behavior, evidence of the person's "severe emotional distress and deterioration in the person's mental condition to the extent that the person cannot remain at liberty." *Id.* at § 573.001(b) (West Supp. 2016). The statute also provides that the peace officer may form the belief that the person meets the criteria for apprehension "from a representation of a credible person" or from "the conduct of the apprehended person or the circumstances under which the apprehended person is found." *Id.* at § 573.001(c) (West Supp. 2016). When a person is taken into custody under the above guidelines, the peace officer is required to immediately transport the apprehended person to the nearest appropriate mental health facility. *Id.* at § 573.001(d) (West Supp. 2016). The Health and Safety Code further requires the officer to file a written application for an emergency detention order, setting forth, among other things, the reasons why he believes the person is evidencing a mental illness and why he believes the person poses a substantial threat to himself or others, providing a "specific description of the risk of harm" and a "detailed description of the specific

11

behavior, acts, attempts, or threats," in order to support his belief that a detention is necessary. *Id.* at § 573.011 (West 2010).

Accordingly, the Health and Safety Code imposes a duty on a peace officer to investigate the circumstances surrounding a mental health call prior to taking the subject into custody and before transporting the subject to a mental health facility. Numerous courts have recognized that peace officers are performing an official public duty when they act under the Health and Safety Code, and in particular when they are determining whether there is probable cause to take a potentially suicidal person into custody. *See, e.g., Cantrell v. City of Murphy,* 666 F.3d 911, 923 (5th Cir. 2012) (peace officers were entitled to qualified immunity for various alleged constitutional violations where police officers acted lawfully in performing their duties under the Health and Safety Code after determining there was probable cause to take a suicidal individual into custody in order to seek an emergency detention order); *see also Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1132 (5th Cir. 2014) (holding that a police officer had qualified immunity where he entered a home without a warrant to investigate a call involving a potential suicide and had a reasonable belief there was an urgent ongoing emergency taking place); *Rockwell v. Brown*, 664 F.3d 985, 988 (5th Cir. 2011) (officers were entitled to qualified immunity where they were conducting their duties in good faith in seeking to take a mentally ill individual into custody after the individual's parents called 911 to report that their son was causing a disruption and acting violently toward them, and after they expressed fear that he might harm himself).

Further, courts have expressly referred to a police officer's attempts to ascertain whether probable cause exists for an emergency detention as being an "investigation." *See, e.g., Lawson v. Marion County, Tex.,* No. 2:13-CV-00105-JRG, 2014 WL 5761121, at *4 (E.D. Tex. Nov. 5,

12

2014) (if a "concerned third party" informs peace officers that an individual is potentially suicidal and the officers' "subsequent investigation" supports a probable cause determination under Texas law, the officers may lawfully take that person into custody); *Beck v. State*, No. 10-08-00365-CR, 2010 WL 3434075, at *4 (Tex.App. – Waco Sept. 1, 2010, pet. ref'd) (mem. op., not designated for publication) (holding a peace officer called to a residence on a child welfare service call was properly conducting an "investigation," and the defendant, who allegedly tried to hide evidence in the officer's presence, could properly be charged with the criminal offense of tampering with evidence while an "investigation . . . was in progress"). And finally, it has been recognized that a peace officer has probable cause to arrest a suspect for interfering with a police investigation under Section 38.15 of the Penal Code. *See Pearlman v. City of Fort Worth,* 400 Fed.Appx. 956, 959 (5th Cir. 2010) (where the suspect intervened with a police officer who had been conducting a "welfare check" on the suspect's niece); *see also Yarbrough v. State*, 429 S.W.3d 118, 124 (Tex.App. – Amarillo 2014, no pet.) (finding that defendant was properly convicted of interference with public duties where defendant used force against police officer who was investigating a domestic disturbance).

The undisputed testimony in the present case demonstrated that Officer O'Connor had been called to the family's residence due to a report that Appellant's sister had a knife and was potentially suicidal. Officer O'Connor therefore had both a duty and the authority under the Health and Safety Code to investigate to determine whether Appellant's sister posed a "substantial risk of serious harm to [herself] or to others," and whether there was probable cause to seek an emergency detention order and to take her into custody in order to transport her to a mental health facility. In order to make this determination, Officer O'Connor testified that he spoke with the

13

mother to verify the facts that had been reported to the 911 dispatcher, and that he then entered the bedroom to speak with Appellant's sister to determine whether she had a weapon that would pose a danger to herself or others.   He further testified that he found it necessary to temporarily restrain the sister before interviewing her, in order to ensure that she did not have a weapon that would have posed a safety risk for all involved.

However, before Officer O'Connor could complete his investigation and determine whether there was probable cause to transport Appellant's sister to a mental health facility or to seek an emergency detention order as required by the Health and Safety Code, Appellant began engaging in her obstructive conduct.   When Officer O'Connor attempted to take Appellant's sister out of the residence in order to interview her in the safety of his patrol car, Appellant pushed him in an attempt to block his exit from the residence.   Because Officer O'Connor's investigation was still ongoing at the time Appellant pushed him in an attempt to impede his actions, we conclude there was sufficient evidence that Appellant interfered with Officer O'Connor's investigation as alleged in the information.   We overrule Issue One.

### The Trial Court was not Required to Submit
### Sua Sponte a Jury Instruction on the Speech-Only Defense

In her second issue, Appellant complains the trial court did not instruct the jury on the statutory speech-only defense contained in Section 38.15(d) of the Penal Code, which provides that:   "It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only."   TEX. PENAL CODE ANN. § 38.15(d) (West 2016).   Appellant acknowledges that she did not request an instruction on the speech-only defense, but contends the provision should be classified as the "law applicable to the case," and that the trial court therefore had a duty to instruct the jury sua sponte on that issue.

14

### Standard of Review

Appellate review of purported error in a jury charge involves a two-step process. *Kirsch v. State,* 357 S.W.3d 645, 649 (Tex.Crim.App. 2012). We first determine whether error occurred; if error did not occur, our analysis ends. *Ngo v. State,* 175 S.W.3d 738, 743 (Tex.Crim.App. 2005); *Martinez v. State*, No. 08-13-00363-CR, 2016 WL 2864952, at *6 (Tex.App. – El Paso May 13, 2016, no pet. h.) (not designated for publication). Second, if error occurred, we then evaluate whether sufficient harm resulted from the error to require reversal. *Kirsch,* 357 S.W.3d at 649; *Ngo,* 175 S.W.3d at 743; *Martinez,* 2016 WL 2864952, at *6.

### Applicable Law

Article 36.14 of the Texas Code of Criminal Procedure requires the trial court to submit to the jury a written charge "distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). Article 36.14 further describes detailed methods by which a party in a criminal case is entitled to object to the jury charge, adding that compliance with those methods is "all that is necessary to preserve, for review, the exceptions and objections presented to the charge and any amendment or modification thereof." *Id*.

In *Posey v. State*, the Court of Criminal Appeals interpreted Article 36.14 to determine whether Article 36.14 requires that certain jury instructions be submitted even in the absence of a request from a defendant. In that case, the Court drew a distinction between instructions pertaining to the "law applicable to the case," which are required even in the absence of a request from a defendant, and instructions on "defensive issues," which are not required to be given absent a request from the defendant. *Posey v. State,* 966 S.W.2d 57, 60-61 (Tex.Crim.App. 1998). In reaching this conclusion, the Court found it significant that the decision to request an instruction

15

on a defensive issue is a discretionary "strategic" decision that is "generally left to the lawyer and the client." *Id.* at 63; *see also Chase v. State,* 448 S.W.3d 6, 12 n.27 (Tex.Crim.App. 2014) (recognizing that the holding in *Posey* was based in part on the "idea that the decision to request a defensive issue is a matter of trial strategy"). In addition, the Court pointed out that allowing a trial court to instruct juries sua sponte on unrequested defensive issues could improperly "impose . . . unwanted" defensive issues on defendants, and could ultimately place appellate courts in the untenable position of hearing complaints on appeal about trial courts submitting unwanted jury instructions. *Posey,* 966 S.W.2d at 63.

The Court recognized that when a defendant requests a defensive instruction supported by evidence, it becomes the law of the case, and the trial court must provide a proper instruction on that issue. When no request is made, however, the trial court does not err in failing to give the instruction. *Id.*; *see also Vega v. State*, 394 S.W.3d 514, 518-20 (Tex.Crim.App. 2013) (re-affirming the holding in *Posey* that it is not error for the trial court to fail to instruct the jury sua sponte on "defensive issues").

### *Analysis*

### *Statutory Considerations*

We must decide whether the speech-only provision contained in Section 38.15 of the Penal Code is either the "law applicable to the case," invoking the trial court's duty to sua sponte instruct the jury, as argued by Appellant, or whether it is a "defensive issue," invoking no such duty under *Posey,* as argued by the State.

The Court of Criminal Appeals provided a framework for making that decision in *Taylor v. State,* 332 S.W.3d 483 (Tex.Crim.App. 2011). In *Taylor*, the defendant was accused of three

16

counts of aggravated sexual assault.  *Id.* at 485.   During trial, the State presented evidence of acts that occurred before the defendant turned 17, despite that Section 8.07 of the Penal Code prohibits the prosecution and conviction of offenses committed by a defendant before turning 17, except in limited circumstances that did not apply to that case.  *Id*. at 485-86.   The defendant failed to request a so-called "8.07(b)" instruction informing the jury that he could not be convicted of any the acts committed when he was under the age of 17.  *Id*. at 486.   On appeal, the defendant argued that the statutory prohibition was the law applicable to the case, thereby imposing a duty on the trial court to give an instruction on the prohibition sua sponte.  *Id.* at 486-87.   The State, on the other hand, argued that this was merely a defensive issue, and that under *Posey* the trial court was not required to provide the instruction without a request.  *Id*.

The Court of Criminal Appeals agreed with the defendant that an 8.07(b) instruction was "the law applicable to the case," rather than a defensive issue.  *Id.* at 489.   In doing so, the Court emphasized the importance of how the Legislature itself has categorized a particular issue.   It explained that in *Posey,* it had determined that a "mistake-of-fact" instruction was an "unrequested defensive issue" in part because the Legislature expressly labeled it as a defense in Section 8.02(a) of the Penal Code, which specifically referred to "mistake of fact" as a "defense to prosecution[.]" The Court concluded that the Legislature's use of this language in the statute "correlates to its classification as a 'defensive issue.'"  *Id.* at 487.   In contrast, the Court in *Taylor* found it significant that Section 8.07(b) does not refer to a "defense" at all, but rather serves as a "prohibition of prosecutions and convictions based upon offenses committed before the age of seventeen."  *Id*.

17

Appellant relies on *Taylor* to argue that the speech-only provision in Section 38.15 is also a "prohibition" against prosecution, and that we should therefore classify an instruction on this provision as the law applicable to the case, rather than a defensive issue. In Section 38.15(d), however, the Legislature expressly referred to the speech-only provision as a "defense to prosecution," using language virtually identical to the "mistake-of-fact" statute in *Posey*, which was found to relate to a "defensive issue." Further, Section 2.03 of the Penal Code expressly provides that a "defense to prosecution for an offense in this code is so labeled by the phrase: 'It is a defense to prosecution . . . .'" TEX. PENAL CODE ANN. § 2.03(a) (West 2011).

Therefore, in light of the statutory language unambiguously designating the speech-only provision as a defense to prosecution, we conclude that the Legislature intended for Section 38.15(d) to be a defensive issue.

### *The Discretionary Nature of the Speech-Only Defense*

Another key factor in determining whether an instruction relates to a defensive issue is whether there may be "strategic" reasons defense counsel might not request the instruction, or whether the instruction is in effect mandatory in nature. *Taylor*, 332 S.W.3d at 487 (citing *Posey,* 966 S.W.2d at 63) ("A feature of a defensive issue is that it is a strategic decision 'generally left to the lawyer and the client.'"). This concept is illustrated by comparing the instructions under consideration in both *Posey* and *Taylor*. In *Posey*, the Court held that the mistake-of-fact instruction involved a discretionary defensive issue, because it was up to defense counsel to determine, as a matter of trial strategy, whether the instruction would benefit his client. *Posey,* 966 S.W.2d at 63. The Court pointed out that a defendant may make the strategic decision not to request an instruction on a particular defense for a variety of reasons, citing the example of a case

in which the evidence on a particular defensive issue was so weak that the defendant would "risk losing [his] credibility with the jury" if an instruction was given to the jury on that issue. *Id.* at 63.

In contrast, in *Taylor*, the Court concluded that the question whether an 8.07(b) instruction should be given does not involve a discretionary defensive issue, contingent upon the defendant's view of the case. *Taylor*, 332 S.W.3d at 487. Rather, the Court explained that because Section 8.07(b) serves as a complete bar to prosecution for acts committed under the age of 17, its applicability is not contingent upon any party's theory of the case. *Id*. (noting that it is "not within the defendant's (or counsel's) discretion to decide whether or not he may be prosecuted for or convicted of offenses committed before turning seventeen"). The Court therefore reasoned that an 8.07(b) instruction is mandatory in all cases in which evidence of such acts has been introduced at trial. *Id*.

Appellant contends that, as in *Taylor*, the State is similarly barred from prosecuting a defendant for offenses involving speech only, not only for statutory reasons but also for First Amendment reasons as well. In particular, Appellant points out that in *Carney*, our sister court recognized that even in the absence of the speech-only provision in the statute, "a verbal interference with a public servant or officer could be defended on grounds of the First Amendment to the United States Constitution." *Carney*, 31 S.W.3d at 396 (citing *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). In *Hill*, the United States Supreme Court struck down a Houston ordinance that was so broadly worded that it would have allowed a defendant to be convicted solely for his speech in arguing with a peace officer, concluding that the ordinance was therefore unconstitutional on its face. *Hill,* 482 U.S. at 461-62. In particular, the Court recognized that "the First Amendment protects a significant amount of verbal criticism and

19

challenge directed at police officers," and that the State may not typically punish a defendant for "spoken words." *Id*. Finding that the Houston ordinance allowed the State to prosecute and convict a defendant for virtually any speech that interrupted a peace officer's duties, the Court concluded that the ordinance was overly broad, and therefore unconstitutional as a general prohibition on speech. *Id*. at 462-63, 468-69.

Section 38.15 avoids the constitutional deficiencies the Court found in the Houston ordinance by including the speech-only provision in the statute. *See Barnes v. State,* 206 S.W.3d 601, 605-06 (Tex.Crim.App. 2006) (recognizing that the speech-only provision is derived from First Amendment concerns). The speech-only provision therefore provides valuable First Amendment protections to a defendant, essentially barring or prohibiting prosecutions for speech-only offenses. In particular, a defendant may not be arrested, charged, or convicted of interfering with a peace officer's duty unless there is some evidence that the defendant engaged in some form of physical conduct, beyond mere speech, in interfering with a peace officer's duties. *See, e.g. Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007) (in civil lawsuit brought by plaintiff for unlawful arrest, the court concluded that the police officers did not have probable cause to arrest the plaintiff for interference with public duties where the police officers only observed her "yelling" and "screaming" at them); *Carney,* 31 S.W.3d at 398-99 (reversing defendant's conviction where the State failed to present any evidence that the defendant had taken any action to interfere with a police officer's duties other than to argue with the officer).

Appellant's argument raises an interesting question. If in fact the State fails to come forward with any evidence to demonstrate that a defendant engaged in any physical conduct that interfered with a peace officer's duties, and instead only presents evidence of the defendant's

20

speech, then the defendant's conviction would be barred by both the speech-only provision in the statute as well as the First Amendment. It is arguable that in light of the constitutional ban on prosecution in such cases, the trial court could have a mandatory duty under *Taylor* to provide an instruction to the jury sua sponte on the speech-only provision. *See, e.g., Taylor*, 332 S.W.3d at 487 (noting that a jury instruction is mandatory where the issue relates to a complete bar to prosecution that is "not contingent upon any party's theory of the case").

We save that argument for another day, however. The case before us does not involve a situation in which the evidence demonstrated that Appellant engaged only in mere speech. Here, the State presented ample evidence that Appellant also engaged in physical conduct that interfered with Office O'Connor's duties. Therefore, there was no statutory or constitutional bar or prohibition against Appellant's prosecution or conviction.[3] In situations such as this where there are conflicts in the evidence, a defendant has a variety of defenses available to him, many of which have nothing to do with the speech-only provision or the First Amendment. In these cases, defense counsel could make a strategic decision not to request a speech-only instruction, as he might believe the evidence so weak that giving an instruction would detract from his defense and risk losing the confidence of and credibility with the jury. For example, defense counsel could make a strategic decision not to request a speech-only instruction in a case where the defendant spoke to a peace officer in a disrespectful or negative manner, believing that such an instruction would improperly focus the jury's attentions on his client's negative verbal behavior, and may

---

[3] Appellant does not contend the State failed to present sufficient evidence that she engaged in physical conduct or that the State's prosecution was based on mere speech. Further, the State presented ample evidence, in the form of Officer O'Connor's testimony, to support the jury's finding that Appellant physically impeded Officer O'Connor in his attempt to take Appellant's sister into custody.

21

instead chose to instead focus solely on whether the evidence was sufficient to prove that he committed the physical acts alleged in the indictment.

In fact, this may have been defense counsel's strategy in the present case, since he did not raise a speech-only defense in his argument to the jury, and never once argued that Appellant could not be convicted on that basis. Instead, defense counsel focused almost exclusively on the claim that Appellant did not engage in any physical conduct that interfered with Officer O'Connor's duties, and that instead Officer O'Connor was the aggressor, making virtually no reference to the statements that Appellant made to Officer O'Connor during their encounter. Similarly, in its closing argument, the State spent little or no time discussing Appellant's statements, and instead argued that Appellant's version of the facts that Officer O'Connor attacked her lacked credibility.

Under these circumstances, requiring a trial court to provide a speech-only instruction sua sponte would effectively require the court to serve as a second trial counsel, assisting the defendant and her attorney in determining which defenses they should and should not present to the jury. Further, requiring a trial court to provide an unrequested instruction under these circumstances would run the risk of imposing an unwanted defense on the defendant, which, in turn, could give rise to a complaint of judicial overreaching—the very danger the Court warned against in *Posey*. *See Posey,* 966 S.W.2d at 63.

Finally, we note that even when requested, submitting a speech-only instruction is not appropriate in every case in which a defendant is charged with interference with public duties. A trial court may properly reject a defendant's request for a speech-only instruction when the evidence does not support submission of the instruction. *See Momentoff v. State,* No. 02-12-00335-CR, 2013 WL 5967107, at *7 (Tex.App. – Fort Worth Nov. 7, 2013, no pet.) (mem.

22

op., not designated for publication) (holding the trial court properly refused defendant's request for a speech-only instruction, where the evidence demonstrated only that the defendant engaged in physical acts that interfered with the peace officer's performance of his duties).

Accordingly, we conclude that a speech-only instruction relates to a discretionary defensive issue, one which a trial court is not required to give absent a request from defense counsel, and only then if the evidence supports the request.

*The speech-only Provision is not an Element of the Offense or an Exception Thereto*

Appellant also argues that the speech-only provision should be considered an "element of an offense" or an "exception" to an offense that the State has the burden to negate, thereby requiring a jury instruction on that issue.[4] We disagree. The speech-only provision is neither an element of the offense nor an exception thereto.

First, the speech-only provision is not an exception to the offense. The Penal Code provides that an "exception to an offense in this code is so labeled by the phrase: 'It is an exception to the application of . . . .'" TEX. PENAL CODE ANN. § 2.02(a) (West 2011). On the other hand, the Code provides that a "defense to prosecution for an offense in this code is so labeled by the phrase: 'It is a defense to prosecution . . . .'" *Id*. at § 2.03(a) (West 2011). In Section 38.15, the Legislature expressly referred to the speech-only provision as a "defense to prosecution," not as an "exception." *Id.* at § 38.15. When an issue relates to a "defense" to a charge, as opposed to an "exception" to the offense, the State has no affirmative obligation to

---

[4] In particular, Appellant contends that the elements of the offense, as charged in the State's indictment, included not only that she interrupted, disrupted, impeded, or interfered with Officer O'Connor's duties while he was performing an "investigation" by "pushing" him, but that "[s]uch interference, disruption, impeding or interference consisted of more than mere speech."

negate its existence. *See id.* at § 2.03(b) (the prosecution "is not required to negate the existence of a defense in the accusation charging commission of the offense").

Moreover, Appellant has cited no authority that would persuade us that the speech-only provision should be viewed as an element of the offense. The one case Appellant cites for this proposition, *Carney v. State*, is inapposite. The court in *Carney* did not discuss whether the trial court was required to give a speech-only instruction to the jury, and it was unclear whether the jury was in fact given any such instruction in that case. Instead, the court in *Carney* addressed only whether the State presented sufficient evidence to sustain the conviction. 31 S.W.3d at 393. The Court concluded that in light of both First Amendment considerations and the speech-only provision, the State was required to prove that the defendant physically blocked the residence in order to support a conviction for interference with public duties. *Id.* at 396. The State, however, presented no evidence of a physical blocking, and instead produced only evidence that the defendant had engaged in mere speech that delayed the officer's entry into the residence. Appellant relies on the court's statement in its conclusion in *Carney* that the State had failed to present sufficient evidence from which a rational jury could have found "beyond a reasonable doubt, the essential element of interference by blocking Trooper Jones's entry into appellant's home *independent of speech.*" *Id.* at 398 (emphasis added).

Although the court in *Carney* indicated that the blocking had to be accomplished "independent of speech," we do not believe the court was elevating the speech-only provision in the statute to the level of an element of the offense. Instead, the court was only recognizing the State's obligation and failure to come forward with evidence that the defendant had engaged in physical conduct that interfered with the officer's duties. In fact, in describing the elements of the

offense, the court did not include that speech-only provision in its description  *Id.* at 396.

Further, the court expressly referred to the speech-only provision multiple times as being a "statutory defense," noting that by charging the defendant with "blocking" the officer's entry, the State "impliedly recognized that interference by speech only is a defense" to the prosecution.  *Id.*; *see also Barnes,* 206 S.W.3d at 605-06 (repeatedly referring to the speech-only provision in the statute as a "defense" to prosecution).

As such, the holding in *Carney* reaffirms our earlier conclusion that the speech-only provision relates to a defensive issue, and that the trial court was not required to give an instruction on that provision absent a request from defense counsel.   Finding no error in the jury charge, we therefore decline to conduct a harm analysis.   See *Posey,* 966 S.W.2d at 62 (because there is no error in failing to give an unrequested instruction on a defensive issue, there is no need to conduct a harmless error analysis on appeal).   Issue Two is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


YVONNE T. RODRIGUEZ, Justice

January 20, 2017

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., not participating

(Publish)

25