**Opinion issued March 15, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00783-CR

————————————

**DION VERNON WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court No. 9**
**Tarrant County, Texas***
**Trial Court Case No. 1577604**

---

\*      Per the Texas Supreme Court's docket-equalization powers, this appeal was transferred from the Second Court of Appeals to this court on October 1, 2019. *See* TEX. GOV'T CODE § 73.001; Order Regarding Transfer of Cases from Courts of Appeals, Misc. Docket No. 19-9091 (Tex. Oct. 1, 2019). We are unaware of any relevant conflict between the Second Court's precedent and ours. *See* TEX. R. APP. P. 41.3.

**MEMORANDUM OPINION**

A jury convicted appellant, Dion Vernon Williams, of four counts of interfering with public duties. In two points of error, Williams challenges the legal sufficiency of the evidence supporting his four judgments of conviction and the trial court's refusal to submit a defensive jury instruction. We modify the trial court's judgment and affirm as modified.

**BACKGROUND**

On September 16, 2018, Williams participated in a peaceful protest against police brutality during the season opener for the Dallas Cowboys at AT&T Stadium in Arlington. Police officers at the stadium were aware ahead of time that the protest would occur, and the officers were instructed to provide "safe passage" to the protesters, block off one lane of traffic from the parking lot to the stadium for the protesters, and escort the protesters as they marched up Randol Mill Street to the Tom Landry statue in front of the stadium before the game. Police officers, including Sergeant S. Peron and Officer C. Abernathy, continued to monitor the protesters as they gathered around the statue as part of their assigned duties to provide security for the protesters and prevent any skirmishes between them and game attendees.

At one point, a group of about ten of the protesters, including Williams, broke away from the main group and formed a "human chain," blocking off an entrance to the stadium. Peron, Abernathy, and other police officers monitored the protesters

2

and redirected foot traffic to other entrances because a "tremendous number of fans" were trying to enter the stadium at that point. After about six minutes, the protesters disbanded and then moved to another, even more crowded entrance, and they again formed a human chain to block the entrance. Peron, Abernathy, and other police officers continued to monitor this group of protesters. The protesters remained at that entrance about three or four minutes, and then walked away from the stadium; Peron, Abernathy, and other police officers continued to follow them.

When the small group of protesters reached the busy intersection of Collins Street and Randol Mill Road, they began walking in a circle, along each crosswalk in the intersection against traffic signals, and blocked most of the traffic attempting to go through the intersection. Peron followed them and repeatedly asked them to step back onto the sidewalk. Additional officers were called to the scene. While the protesters were, in effect, blocking traffic, two firetrucks and two ambulances were attempting to drive through the intersection; each emergency vehicle eventually proceeded through the intersection. After about six minutes, the protesters then left the intersection, followed by a number of police officers, including Peron and Abernathy, but after a few minutes the protesters returned to the intersection of Collins and Randol Mill, walked into the street during a pedestrian walk signal, and stopped in the middle of the crosswalk directly in front of traffic, where they formed

a circle and interlocked arms. As the protesters began to walk away, police officers arrested them.

The State charged Williams by information with four counts of interference with public duties: (1) interfering with an ambulance driver's duties of by walking through the intersection of Collins and Randol Mill; (2) interfering with Peron's duties by walking through the intersection of Collins and Randol Mill; (3) interfering with Peron's duties by blocking an entrance gate of AT&T Stadium; and (4) interfering with Abernathy's duties by blocking an entrance gate of AT&T Stadium. A jury convicted Williams on all four counts. The trial court sentenced Williams to 75 days in county jail but suspended the sentence and placed Williams on community supervision for 12 months. This appeal followed.

## DISCUSSION

### I. Sufficiency of the Evidence

Williams argues that the evidence at trial is insufficient to show that he interfered with the duties of Peron, Abernathy, or the ambulance driver.

### A. Standard of Review

In evaluating the sufficiency of the evidence to support a criminal conviction, we examine all the evidence in the light most favorable to the jury's verdict to determine whether a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244

4

(Tex. Crim. App. 2019); *see also Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (describing standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If an appellate court finds the evidence insufficient, it must reverse the judgment and enter an order of acquittal. *Estrella v. State*, 546 S.W.3d 789, 797 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd).

The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit. *Galvan-Cerna v. State*, 509 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2014, no pet.). An appellate court determines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 17 (Tex. Crim. App. 2007). An appellate court presumes that the factfinder resolved any conflicting inferences in favor of the verdict and defers to that resolution. *Brooks*, 323 S.W.3d at 899 n.13.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was

5

tried." *Id.* The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

**B.     Applicable Law**

Under Section 38.15 of the Penal Code, a person commits the offense of interfering with public duties:

> if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with:
> (1)  a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law; [or]
> (2)  a person who is employed to provide emergency medical services including the transportation of ill or injured persons while the person is performing that duty[.]

TEX. PENAL CODE § 38.15(a)(1)–(2). Criminal negligence is the lowest culpable mental state; a person acts with criminal negligence "with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* §§ 6.02–.03.

**C.     Analysis**

**1.     Interfering with ambulance driver's duties by walking through intersection**

Williams argues there was no evidence that the protesters' activities that day interfered with an ambulance driver's duties or in any way delayed an emergency vehicle. Rather, the evidence showed that traffic was building up at a busy

6

intersection near the stadium on a game day, he argues. The traffic camera video showed the two ambulances in question crossing through the intersection, and so he argues they cannot have been significantly disrupted by the protesters.

At trial, Deputy Fire Chief Gerald Randall testified. He was overseeing public safety operations at the stadium that day. He was stationed at the unified command post, where he could see video monitors showing the "footprint" of the stadium—the roads immediately surrounding the stadium. Randall testified that an ambulance returning from the hospital could not get through the intersection of Collins and Randol Mill because the intersection was blocked and traffic had backed up. He said the small group of protesters walking in a circle around the intersection was blocking traffic. He testified that another ambulance was trying to go from the west side of the stadium to the east side of the stadium to pick up a patient complaining of chest pain, which was a "Priority 1, life-threatening call." The ambulance attempted to go through the intersection of Collins and Randol Mill, but the intersection was closed because of the small group of protesters. After police officers were notified, however, they were able to direct traffic to allow the ambulance to pass through the intersection.

On cross-examination, Randall admitted that the ambulance may not have been delayed by a significant amount of time. He said that he would normally expect an ambulance traveling the same route to take "maybe a minute, minute and a half"

to respond to a call on the other side of the stadium. When defense counsel asked if the call notes for that ambulance showed it reached the patient in a minute and a half, then that would mean the ambulance was not delayed, Randall said, "That would be correct." But Randall disagreed that the protesters had not caused a delay. He explained: "That [ambulance] unit was delayed because the intersection was closed. Traffic was backing up and [the ambulance] had to come around the traffic and creep at a slow rate of speed until the officers could wave [it] through." Further, when a patient is having chest pains, he said, "Time is absolutely of the essence. The lifesaving treatment of chest pain is getting them to an emergency room into a cardiac cath lab. The longer we wait, more heart muscle dies."

Viewing Randall's testimony in the light most favorable to the verdict, we conclude that a rational juror could have found beyond a reasonable doubt that Williams interfered with an ambulance driver's duties by blocking an intersection. *See Alfaro-Jimenez*, 577 S.W.3d at 244.

### 2. Interfering with Sergeant Peron's duties by walking through intersection

Williams next argues that the traffic camera video of the protesters walking in a circle around the intersection showed a scene that is neither chaotic nor disruptive of anyone's duty in any significant way. The multitude of police officers in the intersection were there to follow and watch the protesters, and the protesters were

not staying anywhere long enough to interfere with any police officer's duties, he argues.

Peron testified that at a typical event at AT&T stadium, as stadium sergeant, his duties included supervising other police officers, ensuring public safety, controlling the flow of both foot traffic and street traffic, and making sure attendees have access to emergency services. He explained that he usually worked inside the stadium, but if there was an incident outside the stadium "that rises to the level of [his] being involved in a call," he would go outside. Peron said that on September 16, when he followed the protesters from the stadium to the intersection at Collins and Randol Mill, he "had to walk away from [his] initial duties and responsibilities as the stadium sergeant inside—inside the venue at that time." While the protesters were blocking the intersection, Peron said he and the other police officers were not able to efficiently or effectively direct traffic, and firetrucks were trying to get through the intersection but were delayed because of the "combination" of traffic and protesters occupying the intersection.

Peron admitted that, because of the protest that day, his duties also included following the protesters and the small group of which Williams was a part to protect them, to report back to commanding staff about their actions, and to make sure there were no incidents between the protesters and the game attendees. He admitted that while the protesters were blocking the intersection, some pedestrians were able to

9

cross, some cars were able to pass through, and the emergency vehicles—the firetrucks and the ambulances—did eventually pass through the intersection. Keith Brooks, the Assistant Director of Public Works and Transportation for the City of Arlington who was monitoring traffic flow in the stadium control room that day, admitted that when some traffic is moving through the intersection, it is not completely shut down.

Even though the protesters did not completely shut down the intersection, Peron's duty was to manage the traffic flow, not to ensure the intersection was not completely shut down. Peron stated that his duties included managing traffic flow and ensuring access to emergency services; he also said that when the protesters blocked the intersection, he was not able to manage traffic and emergency vehicles were delayed. Viewing this evidence in the light most favorable to the verdict, we conclude that a rational juror could have found beyond a reasonable doubt that Williams interfered with Peron's duties by blocking an intersection. *See id.*

### 3. Interfering with Peron's and Abernathy's duties by blocking entrance gate to AT&T Stadium

Williams argues that there was no evidence to show the protesters, including Williams, interfered with Peron's or Abernathy's crowd control duties, even though some guests were not able to access the entrance gates; those people only sustained a minor inconvenience when they had to enter through another gate. Nor was there

10

evidence to show that Williams interfered with Abernathy's duties, because his duties that day included ensuring the protesters' safety, he argues.

Again, Peron testified that his duties at the stadium on a game day included ensuring public safety and pedestrian foot traffic flow. Abernathy testified that his duties included coordinating crowd control, maintaining pedestrian traffic flow, and directing people to their entrance gates. When the small group of protesters blocked the entrance gate, Peron called additional officers for backup and said he became concerned that the protesters were creating a "disruption" and preventing attendees from entering the stadium. Abernathy said the group of protesters was creating a problem with crowd control because the officers had to redirect attendees to different gates, some attendees were trying to force themselves around the protesters, and the commotion was creating a "chaotic situation" there at the entrance gate. While some attendees were able to get in through the blocked entrance gates, Peron testified "the majority" of attendees were delayed and could not get through. Abernathy said that some of the attendees yelled at the protesters, and he was concerned for the safety and security of everyone on the scene. The line of people waiting to get into the stadium was growing, and people were getting "visibly angry" about the situation. Abernathy testified that the protesters' blocking of the entrance gates interfered with his crowd control duties because he was engaged in an "ongoing struggle" to maintain the rate at which attendees could enter the stadium, reduce the crowd size

outside the stadium, and prevent any clashes between the protesters and the attendees; it also took his attention away scanning the crowd and identifying other problems that could have been occurring.

Both Peron and Abernathy testified that part of their duties that day was protecting the protesters. Thus, Williams and the other protesters that day were not impeding every duty the officers needed to perform, but the evidence is sufficient for a rational juror to conclude that Williams interfered with Peron's and Abernathy's duties to maintain crowd control and traffic flow. *See id.*

Williams's first point of error is overruled.

## II.    Jury Instructions

Williams next argues that the trial court erred in refusing to include in the jury charge the statutory speech-only defense in Section 38.15(d) of the Penal Code, which provides: "It is a defense to prosecution under this section that the interruption, disruption, impediment, or interference alleged consisted of speech only." Relying on U.S. Supreme Court First Amendment cases, Williams argues that some actions can be considered forms of protected speech, and so the jury should have been allowed to decide whether his actions constituted speech.

### A.    Standard of Review and Applicable Law

We review an alleged jury charge error in two steps. First, we must determine if there is error in the charge, and second, if there is error, we evaluate whether

sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005).

A defendant in a criminal trial is entitled to a jury-charge instruction on every defensive issue raised by the evidence at trial. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007); *see also* TEX. PENAL CODE § 2.03(c). This rule applies whether the evidence raised is strong, feeble, unimpeached, or contradicted, and it applies regardless of whether the trial judge thinks the evidence is credible. *Walters*, 247 S.W.3d at 209. A defense is raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that [the] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). A trial court may properly reject a defendant's request for a speech-only instruction when the evidence does not support submission of the instruction. *Trevino v. State*, 512 S.W.3d 587, 601 (Tex. App.—El Paso 2017, no pet.); *Momentoff v. State*, No. 02-12-00335-CR, 2013 WL 5967107, at *7 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op., not designated for publication).

## B. Analysis

At trial, Williams requested that the jury charge include the statutory speech-only defense. The trial court overruled the request.

On appeal, Williams does not explain how the evidence supports a speech-only defense instruction; he only argues that the jury viewed the video of the protest

13

and should have been allowed to decide whether he was engaging in "speech only." Williams relies on U.S. Supreme Court First Amendment cases concluding that conduct can, at times, be a protected form of free speech to argue here that his conduct was "speech only" within the meaning of Section 38.15(d). Regardless of whether conduct can constitute speech, the defense specifically applies to "speech only" and not to expressive conduct that may be protected as speech. *See Momentoff*, 2013 WL 5967107, at \*7 ("Appellate courts have consistently interpreted [Section 38.15(d)] as protecting only verbal forms of speech."); *Barnes v. State*, 206 S.W.3d 601, 605–06 (Tex. Crim. App. 2006) (holding that mother's shout to her seven-year-old son to run from police did not constitute "speech only" under Section 38.15(d) because it was a command to act and thus conduct); *Dickerson v. State*, No. 01-05-00948-CR, 2006 WL 3316735, at \*4 (Tex. App.—Houston [1st Dist.] Nov. 16, 2006, no pet.) (mem. op., not designated for publication) (affirming conviction under Section 38.15 because defendant's conduct of not restraining her dog and forcing officer off her property did not constitute "speech only"); *Key v. State*, 88 S.W.3d 672, 676 (Tex. App.—Tyler 2002, pet. ref'd) (affirming conviction under Section 38.15 where defendant "engaged in conduct other than speech" by repeatedly stepping off sidewalk against officer's instructions). Section 38.15 is only ever applied to physical conduct; if we were to follow Williams's suggested interpretation, the defense would apply to every alleged violation under the statute,

rendering the speech-only defense meaningless, which we must not do. *See, e.g.*, *Chambers v. State*, 580 S.W.3d 149, 155 (Tex. Crim. App. 2019) (stating that, in interpreting statute, we presume each word should be given effect if reasonably possible).

The evidence presented at trial focused on Williams's conduct, not his speech, although some parts of the protest video show that the protesters were speaking out against police brutality. Still, Peron and Abernathy testified that it was the protesters' blocking the entrance gates that interfered with the officers' duties that day, and Peron and Randall testified that it was the protesters' blocking the intersection at Randol and Mill that interfered with Peron's traffic flow duties and with the ambulance's ability to respond to an emergency call. No evidence was presented at trial that Williams's speech interfered with anyone's duty. Thus, the evidence did not support the submission of a speech-only instruction, and the trial court did not err in refusing overruling Williams's request. *See Trevino*, 512 S.W.3d at 601; *Momentoff*, 2013 WL 5967107, at *7.

Williams's second point of error is overruled.

## III. Clerical Errors in the Judgments

Our review of the record reveals clerical errors in each of the trial court's four judgments. Each judgment states that the jury convicted Williams of obstructing a

15

highway or passageway, but the record shows Williams was charged with and convicted of interfering with public duties under Section 38.15 of the Penal Code.

Although neither party has requested that we modify the trial court's judgments,[1] we may, sua sponte, reform a clerical error in a trial court's judgment to ensure that it reflects the jury's verdict. *See St. Julian v. State*, 132 S.W.3d 512, 517 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). An appellate court may correct and reform a trial court's judgment to "make the record speak the truth when it has the necessary data and information to do so." *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd); *see* Tex. R. App. P. 43.2(b) (court of appeals may modify the trial court's judgment and affirm it as modified). This power is not dependent on a party's request. *Tyler v. State*, 137 S.W.3d 261, 268 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

The record shows that the jury found Williams guilty of four separate counts of interfering with public duties, not obstructing a highway or passageway. The State's amended information, the jury charge, and the verdict all show that the jury convicted Williams of: (1) interfering with an ambulance driver's duties of by walking through the intersection of Collins and Randol Mill; (2) interfering with

---

[1]   The State in its brief acknowledged that the judgments do not correspond with the offenses for which the jury convicted Williams but did not ask us to modify the judgments.

Peron's duties by walking through the intersection of Collins and Randol Mill; (3) interfering with Peron's duties by blocking an entrance gate of AT&T Stadium; and (4) interfering with Abernathy's duties by blocking an entrance gate of AT&T Stadium. Accordingly, we modify the trial court's judgments to reflect that Williams was convicted on four counts of interfering with public duties. *See* TEX. PENAL CODE § 38.15.

## CONCLUSION

We affirm the trial court's judgments as modified.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Rivas-Molloy, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).

17