**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00238-CR**
_____

**LOUIS BENJAMIN GALYNSKY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the County Court at Law No. 5**
**Montgomery County, Texas**
**Trial Cause No. 22-364296**
_____

**MEMORANDUM OPINION**

A jury found Louis Benjamin Galynsky guilty of interference with public duties, a class B misdemeanor. The jury assessed Galynsky's punishment at 180 days of confinement in the Montgomery County Jail. The trial court suspended imposition of the sentence and placed Galynsky on community supervision for 12 months. In two issues, Galynsky challenges the sufficiency of the evidence to support his conviction and argues unobjected-to error in the jury charge caused egregious harm. We affirm the trial court's judgment.

1

## Background

Galynsky was charged with two offenses: criminal trespass and interference with public duties. Both cases were tried together. The State called two witnesses, J.T. and Officer Wesley Nanny.[1] J.T. testified she met Galynsky in a post office parking lot about one week before the incident that resulted in the State's bringing criminal charges against Galynsky. When J.T. expressed a desire to supplement her income with a second job, Galynsky told J.T. that he had properties he was selling and that he would set her up with a real estate course so she could learn to be a realtor. They exchanged phone numbers.

On January 28, 2022, J.T and Galynsky discussed meeting to sign up for an online real estate course. Galynsky asked J.T. if they needed anything and she replied that she could use some dog food because she was pet-sitting for a friend. When Galynsky arrived with the dog food and breakfast, J.T. let him into her apartment. After breakfast, they opened their laptops and began working on signing up for the course, but as time wore on and Galynsky suggested that they go to lunch first, J.T. began to suspect Galynsky was stalling. After an hour Galynsky brought up the subject of bondage, and J.T. decided she wanted him to leave. She told him between

---

[1]We refer to the alleged victim by her initials to protect her privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

five and ten times to leave, and she eventually removed him from her apartment with physical force and closed the door. Galynsky pounded on the door and demanded to be let back in. He said he wanted his property back, including the dog food, some supplements and a box of condoms. She told him he would have to wait for the police to arrive.

Officer Wesley Nanny of the Conroe Police Department testified that he was dispatched to the location of a criminal trespass reported in a 911 call. He spoke with J.T. as part of his investigation into criminal trespass and possible harassment. A 911 dispatcher who had spoken with Galynsky advised Officer Nanny that Galynsky was returning to the location. When Galynsky arrived, Nanny directed him to park his vehicle in a parking space and then to "come out and speak with" Nanny and another officer who was present. After Galynsky parked his vehicle, the officers approached and again asked him to exit the vehicle, but he would not do so. Officer Nanny testified he asked four times for Galynsky to identify himself, but he would not do so. Nanny explained that when he encounters a person who seems agitated, he always tries to get them out of their vehicle because of the possible presence of weapons. Having a suspect remain in the vehicle is an officer-safety issue because the officer cannot prevent the person from grabbing a weapon or driving away in the car. Galynsky failed to exit his vehicle after three requests to do so.

After approximately twenty minutes, Officer Nanny informed Galynsky that the District Attorney's Office had accepted charges at which point Galynsky finally exited his vehicle and provided identification. Nanny explained that he did not forcibly remove Galynsky from the vehicle because he was trying to avoid using physical force. Nanny explained that Galynsky's refusal to leave the vehicle impeded the investigation because an officer had to remain there to ensure Galynsky did not leave, pull out a weapon or try to harm someone with the vehicle. Nanny testified Galynsky reached under the seat several times while the officers were standing next to the vehicle and had called 911 while the officers were trying to speak with him.

Footage from Officer Nanny's body camera was published to the jury. The video depicts Officer Nanny's encounter with J.T., who explained that Galynsky was supposed to have been there for business but really wanted to "date." She asked the officers to give Galynsky a trespass warning. She said they were supposed to work, but Galynsky had brought breakfast, dog food and condoms. The officers asked J.T. how she got Galynsky out of her apartment. J.T. told the officers that she yelled at him, then pushed him out the open door and closed the door behind him. Nanny told J.T. that Galynsky had called 911 and he wanted his box of condoms back. J.T. gave the box of condoms to Nanny. Officer Becker gave J.T. a trespass warning form to fill out.

4

Galynsky drove up the driveway and paused as the officers walked down the steps toward the parking lot. Nanny instructed Galynsky to pull into a parking space and come talk to them. Galynsky told the officers he wanted his condoms back. Nanny held up the box and instructed Galynsky to park and they would talk. Galynsky pulled into a parking space. The officers approached the parked vehicle. Nanny motioned and told Galynsky to come out of the vehicle. Galynsky asked why he would have to get out of his vehicle. Nanny said it would be respectful considering he had called them there. Galynsky replied that in all due respect he just wanted his property. Nanny told Galynsky it was not that simple anymore, because he was going to be served with a criminal trespass warning. Officer Becker asked Galynsky how they could know that he owns the property and that he is the person who called. Galynsky stated he was still on 911. Nanny asked Galynsky for his ID. Galynsky said they were going to force him to file a claim. Then he reached under the seat, pulled out a pad of paper, and asked Nanny for his name and badge number. Nanny asked Galynsky if he had his driver's license or ID card with him. Galynsky asked if he had committed a crime. Nanny replied affirmatively, explaining he was suspected of harassment and criminal trespass. Galynsky said he called the cops. Nanny explained that J.T. did, too. He asked Galynsky for his driver's license or ID card. Galynsky replied that he would not do so voluntarily because he did not feel

5

that he had committed a crime, and he asked Nanny to please hand him his condoms. Nanny said he would not do that.

Nanny called his sergeant, then returned to J.T. and retrieved the trespass warning form. He confirmed that J.T. told Galynsky to leave while he was in her apartment and that Galynsky refused to leave. Nanny asked J.T. if she would be willing to press charges for criminal trespass and she responded that she would.

When Officer Nanny returned to Galynsky's vehicle, Galynsky was still inside, and Officer Becker was standing next to it. Officer Becker confirmed they were investigating Galynsky for criminal trespass and told Galynsky that while he was under investigation he was not free to go. When the sergeant arrived, he spoke with Nanny, who then returned to Galynsky. After asking Galynsky to keep his hands where they could see them, Nanny informed Galynsky that the Montgomery County District Attorney's Office was accepting charges for failure to ID and for refusing to exit the vehicle. Galynsky denied that he refused to ID and pulled a card out of his wallet. He also denied refusing to exit the vehicle, unbuckled his seat belt, opened the door, exited the vehicle, and told Officer Becker not to touch him. The officers arrested Galynsky.

At the conclusion of the evidence Galynsky moved for directed verdict on the criminal trespass charge because there was no evidence Galynsky entered the dwelling without J.T.'s consent. *See* Tex. Penal Code Ann. § 30.05(a)(1). The State

6

responded there was evidence Galynsky remained on the property after having been told to leave. *See id.* § 30.05(a)(2). Noting that the Information charged only that Galynsky "[d]id intentionally, knowingly enter a habitation of another … without the effective consent of … the owner, and did then and there have notice that entry was forbidden[,]" the trial court granted Galynsky's motion for directed verdict and submitted the case to the jury only on the charge of interference with public duties. The jury found Galynsky guilty, and Galynsky timely appealed.

Analysis

In his first issue, Galynsky challenges the legal sufficiency of the evidence to support his conviction. The jury is the exclusive judge of the credibility of the evidence and the weight to be given to that evidence. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). As such, the jury is responsible for resolving conflicts in the testimony, is free to believe some, all or none of a witness's testimony, and may assign as much or as little weight to a witness's testimony as it sees fit. *Id.* Jurors may also draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* at 16.

When examining whether a criminal conviction is supported by legally sufficient evidence, we compare the evidence to the elements of the offense as

7

defined by a hypothetically correct charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). We consider all the evidence, viewed in the light most favorable to the verdict, along with the inferences that could reasonably be drawn from the evidence. *Hooper*, 214 S.W.3d at 13. We do not assess the credibility of the evidence, reweigh the evidence, nor substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The evidence is legally sufficient to support the conviction if any rational trier of fact could have found each of the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also, Garcia v. State*, 667 S.W.3d 756, 761-62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

A "hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019). "As authorized by the indictment" means

8

the statutory elements of the offense as modified by the charging instrument. *Id.* The Information in this case alleged that on January 28, 2022, in Montgomery County, Texas, Galynsky "did then and there, while Officer W. Nanny, a peace officer, was performing a duty or exercising authority imposed or granted by law, to-wit: Refused to comply with Officer's orders impeding his investigation, with criminal negligence, interrupt, disrupt, impede or interfere with the said Officer W. Nanny by not exiting the vehicle[.]" The Penal Code provides, "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law[.]" *See* Tex. Penal Code Ann. § 38.15(a)(1).

Galynsky argues the evidence is legally insufficient to support his conviction because he was asked to exit his vehicle only during the initial stage of his interaction with the officers – which he characterizes as a "consensual encounter" – and neither officer repeated the request to exit the vehicle once the encounter became an "investigative detention." Citing *Crain v. State,* Galynsky asserts, "Because Becker and Nanny were not investigating and lacked a legal basis to detain Appellant, Appellant's decision not to exit the vehicle after Nanny's request could not constitute interference with a public duty." 315 S.W.3d 43, 48 (Tex. Crim. App. 2010). We do not find *Crain* to support Galynsky's conclusion.

9

*Crain* explains the distinction between encounters and investigative detentions as follows: "An encounter takes place when an officer approaches a citizen in a public place to ask questions, and the citizen is willing to listen and voluntarily answers. On the other hand, an investigative detention occurs when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave." *Id.* at 49. This distinction was important in *Crain*, because the issue in that case was whether the trial court was required to suppress evidence the police obtained during their interaction with Crain, necessarily requiring the court to determine whether the interaction was sufficient to trigger Fourth Amendment protections against unreasonable search and seizure. *Id.*

Galynsky did not seek to suppress any evidence, and the penal statute Galynsky was found to have violated did not require the State to prove Galynsky was being detained, lawfully or otherwise, when he allegedly interfered with the officer. *See* Tex. Penal Code Ann. § 38.15(a)(1). The elements of the offense are: "(1) A person (2) With criminal negligence (3) Interrupted, disrupted, impeded, or otherwise interfered with (4) A peace officer (5) While the peace officer was performing a duty or exercising authority imposed or granted by law." *Roemisch v. State*, No. 11-15-00090-CR, 2017 Tex. App. LEXIS 12112, at *10 (Tex. App.—Eastland Dec. 29, 2017, no pet.) (mem. op., not designated for publication).

10

Peace officers have a statutory duty "to prevent and suppress crime[.]" Tex. Code Crim. Proc. Ann. art. 2.13(b)(1). "Investigation of suspected criminal activity results in the prevention and suppression of crime." *Landrum v. State*, 751 S.W.2d 530, 531 (Tex. App.—Dallas 1988, pet. ref'd); *see also State v. Whiteley*, No. 05-94-01212-CR, 1996 Tex. App. LEXIS 1268, at *5 (Tex. App.—Dallas Mar. 27, 1996, no writ) (not designated for publication) ("A police officer has authority to investigate suspected criminal activity."). Therefore, to establish the fifth element, the State was required only to prove that at the time of the interference, the officer was investigating suspected criminal activity. Officer Nanny testified that when he and Officer Becker first arrived at the scene, they were investigating criminal trespass of a habitation and possibly harassment based on the information obtained from J.T.'s 911 call that someone would not depart her property, and was beating on her door, after having been asked to leave. Nanny testified:

> [J]ust to be clear, on our way to this call, we get call notes in our computer that say, you know, male is, you know, trespassing, and refusing to leave. So while at that point I had not heard it from her mouth, that is what she told 9-1-1 dispatch and that is the call notes. So I already had kind of started investigating that based on the call notes that was given by dispatch.

We conclude the record contains legally sufficient evidence the officer was investigating suspected criminal activity when the alleged interference occurred. Although we reject Galynsky's argument the State was also required to prove the officer had reasonable suspicion that Galynsky had committed a crime, we conclude

11

the record contains such evidence. When the officers spoke to J.T., she said Galynsky would not leave her apartment voluntarily, and after she forced him out he repeatedly banged on her door. J.T. gave the officers a brief description of Galynsky and identified his car as a silver Mercedes. Galynsky argues that at this point, the officers were not investigating a crime because they intended only to give Galynsky a trespass warning. However, Officer Nanny testified:

Q. Now, at this point, you are conducting what we consider a lawful investigation, right?

A. Yes, sir.

Q. Because you have that reasonable suspicion?

A. Correct.

Q. And when conducting a lawful investigation where someone is a suspect, they have to comply with any lawful orders, correct?

A. Correct.

The officers then spoke to the 911 dispatcher who told them Galynsky was coming back to the location, after which Galynsky pulled into the parking lot in a silver Mercedes. Nanny testified that "[a]t that point" he had "reasonable suspicion that [Galynsky was] the one who committed the trespass[.]" The officers then asked Galynsky three times to exit his vehicle, and four times to provide identification, and Galynsky repeatedly refused to comply. A rational trier of fact could have found beyond a reasonable doubt that when Galynsky refused to exit the vehicle, Officer

12

Nanny was "performing a duty or exercising authority imposed or granted by law," to wit: investigating suspected criminal activity. *See* Tex. Penal Code Ann. § 38.15(a)(1).

Citing *Barnes v. State*, Galynsky argues his refusal to exit his vehicle was not an affirmative physical action that impeded the officers' duties. *See* 206 S.W.3d 601, 605-06 (Tex. Crim. App. 2006). In *Barnes*, the appellant argued that because she had already been detained when she moved her car forward, her act did not interfere with the detention. *Id.* at 605. The Court of Criminal Appeals rejected her argument, because the movement of her vehicle raised the possibility of flight and "[f]ailing to keep her hands in the open after being instructed to do so was an act in defiance of the detention itself[.]" *Id.* Nanny testified that he instructed Galynsky to exit his vehicle as a matter of officer safety and that Galynsky's refusal to exit the vehicle prolonged the investigation.

Galynsky contends that his continued arguing with the officers, not his refusal to exit the vehicle, delayed the investigation. As supporting authority, he cites *Carney v. State,* 31 S.W.3d 392, 397 (Tex. App.—Austin 2000, no pet.). In *Carney*, the information alleged that the defendant interfered with the officer's assistance with the execution of a search warrant by blocking the officer's entry into a residence. *Id.* at 396. None of the armed officers expressly testified that the defendant blocked their entry into the house by physical action. *Id.* at 398. There

was evidence that the defendant was facing the officers and in front of the door while he continued arguing, but there was no evidence that he was up against the door physically preventing entry. *Id.* The appellate court concluded a rational trier of fact could not have found beyond a reasonable doubt, the essential element of interference by blocking the officer's entry into the home independent of speech. *Id.*

Here, regardless of what Galynsky was saying as he remained in the vehicle, there was legally sufficient evidence that his very refusal to exit the vehicle constituted interference. Officer Nanny testified:

> Q.     Specifically him not exiting the vehicle, how did that specifically impede your investigation?
>
> A.     So for one, we have to have one of our officers staying to make sure that he doesn't, one, leave; two, turn on the vehicle and try and harm someone with it; and, three, potentially pull a weapon out of somewhere. Several times during the encounter, he had reached under his seat and I had to tell him, Hey, let's avoid reaching under your seat when we're standing here because we don't know what's under the seat. I approached him again. His hands are kind of down by the door. I can't see his hands. People carry guns all over the place. You never know when one is going to be pulled on you. So it took an extra officer, which is Officer Becker, to maintain, essentially, security on him while I ran around and try and did more investigation.

A rational trier of fact could have found beyond a reasonable doubt that by refusing to exit the vehicle, Galynsky interfered with Officer Nanny while he was investigating suspected criminal activity.

Galynsky argues the evidence was legally insufficient to prove that he acted with criminal negligence. As supporting authority, he cites *Segovia v. State,* 543

14

S.W.3d 497 (Tex. App.—Houston [14th Dist.] 2018, no pet.). In *Segovia*, the defendant disregarded multiple commands from officers directing traffic to stop at a busy four-way intersection. *See id.* at 499. The appellate court concluded a rational trier of fact could have found beyond a reasonable doubt that the defendant should have been aware that there was a substantial and unjustifiable risk that his actions interfered with the officers as they tried to direct traffic and that his failure to perceive that risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Id.* at 501. Galynsky argues a reasonable person would assume from the actions and attitudes of the officers that Galynsky was detained and cooperating with the officers' investigation. We disagree. Nanny testified that when Galynsky asked to get his property back, Nanny told him it was not that simple because he was going to receive a criminal trespass warning, and he further informed Galynsky that he was suspected of criminal trespass and harassment. From this evidence, a rational trier of fact could conclude beyond a reasonable doubt that Galynsky's continued refusal to follow the officer's previous instructions to exit the vehicle was a gross deviation from the standard of care an ordinary person would have exercised under like circumstances.

Viewed in the light most favorable to the prosecution, a rational tier of fact could find beyond a reasonable doubt that Galynsky, with criminal negligence, interrupted, disrupted, impeded, or otherwise interfered with a peace officer while

15

the peace officer was performing a duty or exercising authority imposed or granted by law. We overrule issue one.

In issue two, Galynsky contends he suffered egregious harm from the exclusion from the jury charge of an affirmative defense instruction that interference cannot constitute speech alone. A trial court has a duty to correctly charge the jury on the law applicable to the case. *See* Tex. Code Crim. Proc. Ann. art. 36.14. "[A] defensive issue is not 'applicable to the case' for purposes of Article 36.14 unless the defendant timely requests the issue or objects to the omission of the issue in the jury charge." *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998). "Though the evidence might raise a defensive issue, it does not necessarily follow that a trial court has a duty to *sua sponte* instruct the jury on that issue when the defendant does not request such an instruction." *Id.*

Galynsky cites *Shaw v. State*, as supporting authority. *See* 243 S.W.3d 647, 657-58 (Tex. Crim. App. 2007). In *Shaw*, the defendant asked the trial court to instruct the jury on the Good Samaritan defense. *Id.* at 655. Galynsky neither requested a speech-only instruction nor objected to its absence from the charge. "[A] speech-only instruction relates to a discretionary defensive issue, one which a trial court is not required to give absent a request from defense counsel, and only then if the evidence supports the request." *Trevino v. State*, 512 S.W.3d 587, 601 (Tex. App.—El Paso 2017, no pet.).

16

Galynsky did not request an instruction on a "speech only" affirmative defense. Moreover, the application portion of the charge specifically instructed the jury that unless they found beyond a reasonable doubt that Galynsky interfered with the officer's investigation "by not exiting the vehicle," they should acquit Galynsky. This instruction negated the possibility of a conviction based on speech alone. We conclude the trial court did not err by failing to include an additional, unrequested "speech only" instruction. We overrule issue two and we affirm the trial court's judgment.

AFFIRMED.

KENT CHAMBERS
Justice

Submitted on March 17, 2025
Opinion Delivered July 2, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

17